Thank you, Your Honor. Good morning, Zandra Lopez of the Federal Defenders. On behalf of Ms. Martinez, I will be watching the clock and attempting to reserve two minutes of my time for rebuttal. At trial, the jury heard multiple pieces of inadmissible evidence regarding a prior 2013 border crossing. They then heard that Ms. Martinez was involved in a, quote, where she was driving a different car loaded with drugs. By then, the damage was too big and the ability to cure was too late. This court must reverse her conviction. The district court applied the wrong legal standard for determining whether to grant a mistrial, and its analysis was illogical and without support in the record. The heir was not harmless. So first… The witness list was presented that the parties shared in advance of trial, and the docket is a little unclear about that. So was there a witness list that was provided to the defense so that you would know which witnesses were coming forward? I'm not sure, Your Honor. I can look into that. I know there is some confusion regarding the docket, but what I, from the record, it's clear that the defense attorney is the one that brought up that looking at the witness list by the time that Agent Bernal was testifying that there was witnesses missing, um, in order to compare them. I guess what I'm trying to figure out is, if there was a witness list provided in advance of trial, then the defense would have been on notice of how the government intended to demonstrate their case, and if there was no person listed on that list that would have had information about that prior incident, could have raised the objection earlier. Well, Your Honor, it's our position that the defense did raise the argument in the pretrial motions, and specifically said that there weren't similarities. The government is the one that made representations that it would have witnesses and evidence to prove these similarities, and the district court itself found that it relied on the representations of the government in allowing the evidence in. Yeah, I mean, I think that argument makes total sense from your side. I'm trying to figure out exactly how that plays out, because if everybody knew who the possible witnesses were in advance, then maybe you would be able to test that. If not, if there was no witnesses provided, then it does seem like the defense was put at a bit of a disadvantage in terms of the motion in limine ruling and the expectation the court had about how this information was going to come in. The defense sort of lets the air out of the sail a little bit preemptively, and then it's too late, right? I mean, that's your argument. The argument is that the district court applied the wrong legal analysis when it was finally discovered that the government couldn't prove what it promised that it was going to prove. Since the district court abused its discretion when it denied the motion for mistrial, when it relied in only two factors, and those were bad faith. And the court specifically referenced only bad faith when denying the motion for mistrial. It said it was denying it because, number one, it didn't find that the government acted intentionally. And then, number two, in its pretrial motions, it found that it was in bad faith, and the court said, at this point, I'm not prepared to grant a motion for mistrial for the government's papers. Even if we were to agree that the district court applied the wrong standard, why wouldn't it be harmless error? Your Honor, I urge Your Honors to look at Foster, which is a border smuggling case similar to this case, where the court found that it was not harmless. There, there were similar facts, including more than 100 packages concealed throughout the cart and consistent statements by the defendant. But the district, but this court found that although, although the deny knowledge story was less than compelling, the story is plausible. And because of that, it was harmless. And I'd like to address several of the circumstantial evidence that the government uses in order to argue that there was knowledge. So first, the non-factory compartment. I think the argument by the government is it could not have been built the night before Ms. Martinez's arrest. But the way that evidence was developed at trial, at ER 107, 288, 321, Armando had access to that car well in advance before Ms. Martinez's July arrest. In fact, he admitted to purchasing the car, and the car was purchased in April. Although he said that was the only time that he was in the car, that was a lie because it later came out that he was also in the car in May when it crossed from Mexico into the United States. So Armando had access to the car well before the date of arrest, well before that night. Also, the drugs weren't visible to the driver. At ER 191, 193, there's a discussion about the pictures that were taken by the primary officer, and those pictures do not show that from Ms. Martinez's position she would have seen the drugs hidden in her car. Also, the primary officer at 134 described how he drove the car from primary to secondary, and he did not state that he saw the drugs at any point from when he was in the same position as Ms. Martinez. Finally, as to Armando, the government's argument is that Armando destroys Ms. Martinez's credibility, but Armando also had a motive to lie. He was being implicated in this offense, and so of course he's going to lie. Also, his daughter was detained at the border, so he had reasons to lie, and he was also impeached multiple times. He tried to distance... I mean, the problem for you there is if you're coming down to a credibility issue, then I mean, we give a lot of deference to the jury, right? The jury heard the evidence and heard the witnesses, and so that seems like a hard argument to make. But the deference is given when, the problem here is that the jury heard that Ms. Martinez had smuggled a car, similar, smuggled drugs in a similar fashion to the way she did now. Well, there was a curative instruction, and jurors are presumed to follow the instruction, so can you tell me, despite that presumption, why there's still prejudice? You're focusing on the weakness of evidence, I understand that, but this was a curative instruction offered by the defense, and the court read it as the defense asked it to, right? Yes, Your Honor, but there's two things, there's two problems with it. One, the prejudice was our position is that the prejudice was too big to cure, and by the time the curative was given, it was way too late. So, it was insufficient because of the amount of cumulative prejudicial evidence that came in. The jury heard that Ms. Martinez was suspected of smuggling something back in 2013, and they heard that from Agent Dawson. They heard that she was suspected of smuggling something like human smuggling, drugs, or bringing medications, and then through Agent Burnell, they heard that after he arrested Ms. Martinez, he went back and investigated the events of 2013, and he interviewed Ms. Martinez's associate back from that time. So basically, the gist of your argument is, even though the jury was told to ignore that, it's too hard to unring the bell when you weigh in the weakness of the knowledge evidence. That's correct, Your Honor, plus it was way too late. This is different because in this case, the evidence came in with the anticipation that it could come in, so it all came in freely without any immediate instruction. So, for the jury, they heard piece by piece all of these inadmissible evidence, layers of evidence. So, at the very end, it was natural for the jury to conclude that in 2013, Ms. Martinez was, again, smuggling, driving a car loaded with drugs, just like she did in 2013. So I see my time is running out. Thank you, counsel. Good morning, Your Honors. May it please the Court, Mark Rahe for the United States. Judge Forst, to get to the question you asked, an excerpt, or not excerpt, ECF Document 46 was the government's trial brief, and that was filed 10 days before the trial. That list of witnesses, and none of the witnesses on that list were from Arizona. And, you know, the government... Did the government suggest or directly tell the district court when you were arguing the motion in limine that you were going to have somebody who was going to be able to talk about the Arizona incident? Not from Arizona, and I'm glad you brought that up, too, because as I was reviewing the record again, and, you know, this is primarily one volume of excerpt of record 23 through 26. At the time this was litigated pretrial, there was never any specific commitment to exactly how this was going to be proven. When the district court admitted it, some district judges say, all right, I want to know up front how is this going to be proven. You don't see that here, but what you do see is a consistency, and maybe in retrospect it wasn't enough. But if you compare excerpt of record volume one, page 24, that's during the motion in limine hearing, the prosecutor saying, look, we have text records that show the crossing and the stop at the border patrol checkpoint, and we have her statements and her plea agreement. And that was the pretrial litigation, and then during the mistrial motion, the judge said, okay, hey, wait a second, how exactly are you proving this? And this is at one excerpt of record, page 35, the same prosecutor says the text records and the plea agreement statements. Now, at that point, the judge felt that that wasn't good enough, but the only reason I bring that up is to say, you know, I know that you see a current in the defense briefing or even below, they pulled the rug out from under us. It would be one thing. I wouldn't be able to stand up here and represent otherwise if we had told the court, you know what, we want this prior incident, and here's Agent Smith, Agent Thompson, they're on the witness list, and then at the last second, they get pulled away. None of that happened. Here, ten days before trial, the defense was given that witness list. I know your clerk's going to access that ECF 46, so I'm happy to provide a copy and a 28J letter, but the only point I want to make out is that, you know, this wasn't some reckless roughshod thing. The wanted to prove it. Now, that said, I know my counsel is also claiming that the court applied the wrong legal standard. You know, there really is no bright line defined standard, and even in the reply brief, we point out that it's just a totality of the circumstances. In the reply brief, the defense cites a case, United States v. Escalante, from 1980, that makes the exact same point. Here, what the court did, and I believe it is federal rule of criminal procedure that also governs 26.3, what it says is that before a court considers a mistrial, it has to give both parties the opportunity to be heard. That's exactly what the court did here. When that mistrial, when you look at that transcript, the judge already had all the transcripts up, said let's talk about this. He heard a whole bunch of considerations. The defense wants to make it seem like somehow it was just about his finding that the prosecutor didn't have bad faith. We would disagree with that. That wasn't the only thing the court said. Obviously, in a totality of circumstances analysis, every district judge is free to give certain circumstances more weight than others. Had the district court denied a mistrial but found bad faith by the government, you would be hearing the defense saying that that would be an abuse of discretion. So here, if the district judge three times found no, you know, inappropriate or bad faith contact, that doesn't mean the court applied the wrong legal standard. That's just a circumstance that the court pointed out. But the defense also claims that the court didn't take into account prejudice enough. Again, the government would disagree. The court said, look, it was a very, it was just one question. I immediately asked the jurors to disregard the question. Earlier during defense counsel's presentation, the question was posed, why shouldn't we assume that the judge followed the instructions? And here, of course, the curative instruction that the defense asked was given verbatim. You have Supreme Court cases, I believe March v. Richardson, going back decades that say we presume. I've been doing this 25 years. This is the first time I've ever seen a record where we have the voir dire. This jury was actually vetted for bias on this. Two questions were asked. If you ever hear, and this is, again, this is at volume two of the excerpt of record, pages 52 to 53, if you were to hear that Ms. Martinez was arrested on a prior drug case, would that affect your views? Would anyone think that because she hasn't experienced one of the drugs in the past, she's more likely to have committed the charged offense, which goes right to the heart of 404B? Nobody responded to that, and the only two jurors who later hearkened back to that didn't make it on to the jury. What is your main evidence that you would point to to establish knowledge? Oh, I'm glad you asked that, too, Your Honor. Driver, sole occupant, registered owner of a car with 100 pounds of meth, 2.94 kilograms of fentanyl worth up to $300,000 wholesale. Those drugs were in packages literally surrounding her. There was a point during the opening presentation about how the drugs were all hidden. That's not entirely true. This defendant had a dog in the back of the truck. There's bags of dog food right over the spare tire well. The officer testified all he had to do was lift it up, and you see multiple packages there. But beyond that, that's just physical evidence. Text records were introduced. If the whole point is, you know, somebody, some third party set me up, am I following the same pattern every day? No. In 26 border crossings, bless your heart, she only had a passenger once, and it was never that she crossed at the same time of day, you know, the same time of the week. When she got to primary inspection, she was overly talkative even though it was 4.30 in the morning. She had $4,100 in cash on her. And then the final thing I'll point out, because this was also brought up, Armando Carballo, this is the, what, you know, the majority of our importation cases plead out. The ones that go to trial, it's always the same. Oh, it's not me. A third person set me up. Here, that third person was a man named Armando Carballo, a close family friend, a part-time lover of the defendant. He testified. I've never seen that either. He literally took the stand, and, you know, the defense can quibble with the credibility. She claimed that he gave her the car the morning of her arrest. That's an incredibly important fact. He got up and testified directly to the contrary. She testified, or the defendant claimed in her post-dress statement that Armando gave her the $4,100 in cash. He directly testified otherwise. That kind of a thing, and he was the first witness out of the gate. We didn't even do our usual thing of, oh, I'm the primary officer, here's the secondary officer. No. The first witness we called was Armando Carballo. And then the one last thing I forgot to mention, too, is that the automobile expert. He testified, you know, the drugs could only be accessed from inside the car. No signs of external force entry. The car could only be opened with the transponder key that the defendant had in her possession. And that whole thing about the compartment, it needed at least 24 hours for the sealant to dry, which was dry. So if we somehow, after all that, that's, the government would say is overwhelming. Of course it's still circumstantial. Cases where people confess rarely go to trial, but when one considers the totality of the circumstances here, the government would stand on that evidence as proof of harmless error. And unless the court has any further questions, the government would submit. Thank you, counsel. A couple of factual points. The government keeps mentioning $40,000, and that's nowhere in the record. I believe $3,500 in cash was found in her duplicate keys. The testimony came out at trial that the keys could have been duplicated, and as stated in Velarde Gomez, Ms. Martinez could have been followed. So there was all these explanations as to how the drugs either got in or got out of the car, and that was all presented during trial. As to the district court's analysis of prejudice, the government references the fact that the court said it was limited. But that limited analysis was only based on that one question posed to Agent Bernal. The district court failed to grapple with all of the evidence, all of the cumulative evidence admitted against Ms. Martinez. Evidence that the court below found to be inadmissible under 404B. And unless the court has any other questions, I submit. It doesn't appear that we do. Thank you very much, counsel, to both sides for your argument. The matter is submitted.
judges: NGUYEN, FORREST, VANDYKE